I just want to make a few points. The CBACA decision makes no finding about the cause of the corrosion that grounded the aircraft at issue. The decision states on page 7 of the appendix, the evidence regarding the corrosion is inconclusive. So the CBACA did not find that a defecting aircraft caused the corrosion. CBACA did not find that TKCA, the contractor, caused the corrosion. The board did find that in 2005, the Coast Guard leased an executive jet from TKCA for the next six years. The board also found... How do you leave that point? I mean, you say they made no findings. They did make one, which seems to me, important finding that's problematic for your client, which is they found that the Coast Guard wasn't responsible for the corrosion, or at least the evidence didn't support that. They found that there was no lack of maintenance on the part of the USCG that contributed to the corrosion problem. You're correct, Your Honor. And as stated in the filings before this court, we believe that finding was not supported by substantial evidence. I understand. But the way you began, I thought you were saying that there were basically no contrary findings to your position. This is a contrary finding. That's correct. But the point I'm trying to make, Your Honor, is regardless of the cause of the corrosion, the Coast Guard was still responsible for preventing it. Specifically, in 2009... Are we looking here? Are you asking us to review the findings of the board with respect to fulfillment of obligations under the contract? I think this court can decide this case by a simple interpretation of the contract. Contract provisions were clear. They placed responsibility on the Coast Guard for the day-to-day maintenance of the aircraft, specifically corrosion control. In addition, there's other clauses... Apparently, both parties had some sort of obligation as to maintenance, correct? Your Honor, that's the argument the government has tried to make. But that really turns the contract on its head. And to understand this, it takes a little bit of understanding of how aircraft are maintained. Aircraft need to be maintained on a day-to-day basis. They need to be inspected on a day-to-day basis. Systems have to be checked on a day-to-day basis. And under the contract, the Coast Guard assumed all those responsibilities. Responsibility that TKCA assumed is under 5.7.3 of the contract. That's depot maintenance. What that means is once or twice a year, the aircraft has to get flown to a facility, an FAA-certified facility, for a detailed inspection. And in fact, every two years or so, it's what's called a structural inspection, where they actually tear the aircraft apart to make sure there's no problem. What the government has tried to argue is by taking that depot maintenance responsibility, that TKCA and Bombardier were somehow responsible for the day-to-day maintenance of the aircraft. That's not the case. That's not the case under both the... Wasn't the TK... I've been pronouncing it TECO, but... TKCA. TKCA. Correct. Wasn't the TKCA person on the ground to supervise the unit-level maintenance? The quote is monitor. Monitor all activities that the Coast Guard were undertaking. One of those activities was maintenance. But in actual performance of the contract... What do you mean by monitor? They're just to look at what's going on, to observe, or to make sure that proper maintenance procedures are being followed. Well, the way it worked out, Your Honor, that monitor responsibility was taken away from TKCA, because what happened during performance of the contract... And the officer for the Coast Guard that was in charge of this is Chief Horn Officer Fitzgerald. He testified before the court. We didn't need direction from TKCA on how to maintain the aircraft. We knew how to maintain the aircraft. There was factual dispute over what he did. I mean, there's no doubt that you paid him to be there full-time. Oh, correct. And his responsibilities went far beyond monitoring the aircraft. When you maintain an aircraft like this, parts have to be delivered on a daily basis. They have to be properly cataloged. You have to schedule the way the aircraft is being flown. Monitoring the Coast Guard's work was one aspect of what his job was. But we're talking about one person versus a crew of 10 to 12 Coast Guard people that were in charge of the aircraft on a day-to-day basis. Also... Was there any training obligations involved? Absolutely. Under the contract, that's another thing that this individual had to do. He had to schedule all the training. It's in the record. I believe there were, at one time or another, 32 different Coast Guard people were trained on different aspects, different systems for the aircraft. How about on corrosion detection? That would be part of the maintenance training. And there were... Does the record show that there was maintenance training for corrosion detection or prevention? Your Honor, if you look at Section 5.7 of the contract, which is the first sentence of the maintenance provision of the contract, it talks about the standards that are to be applied when maintaining the aircraft. And the Coast Guard has its own corrosion protection or corrosion control guidelines. I'm aware of that, but that's not my question. My question was, was there ever any training by TKCA on corrosion detection? TKCA trained various Coast Guard representatives on the maintenance aspect, and that included corrosion training, corrosion control training. That was one aspect of the overall maintenance of the aircraft. That was part of... If you look at Section 5.7.1.2 of the contract, it goes into great detail of what are unit-level maintenance responsibilities. Corrosion control is just one of them. It happened to be the issue in this case. But there's literally a list of about 20 different items that fall under unit-level maintenance, and corrosion control is one of them. Is the conclusion that TKCA had day-to-day supervisory responsibility regarding maintenance of the aircraft a factual conclusion that was based on the disputes in the testimony? Or is it a legal conclusion? Or was there a factual conclusion that was used to support the interpretation of the contract? What is it? Your Honor, there is no contractual basis to find that TKCA had day-to-day maintenance responsibility of the aircraft. In fact, the contract says the opposite. To the extent that the Board made that finding, that is a clear error of law. What happened in this case is TKCA, at most, responsibility was to simply monitor the work that the Coast Guard was performing. Again, the Coast Guard had a crew of 10 to 12 individuals that were assigned to the aircraft. Also, the aircraft flew on various missions, so it was only in the home base on occasion. It would often go throughout the world. So to say that TKCA had any kind of day-to-day responsibility for the aircraft, just not the way it worked out. But the ultimate question as to liability, at least for the expense of the repairs, comes down to, doesn't it, whether there was a failure by the Coast Guard in its responsibilities under the contract that led to the damage, right? Your Honor, there's no other explanation for the damage. Well, one aspect of the damage, at least, could be attributed, I suppose, as one of the TKCA employees said, to the fact that in 2008, they didn't find the corrosion, or at least all of the corrosion, and therefore that exacerbated the problem in 2009. That's a statement, as I recall from the record, by a TKCA employee, right? That was a statement by the TKCA employee. Right, so we already have at least some evidence that at least all of the corrosion was not attributable to day-to-day maintenance problems, or at least the amelioration of the corrosion. That was the initial conclusion when the corrosion was first found in one statement. That was later explained in testimony at trial and in further communications with Bombardier when it turned out that where the corrosion was found, when they lifted up the carpets, they were wet and moldy. The corrosion was focused on one area of the aircraft, closest to the galley, and it ran back just like moisture would run back if it came from the galley. And this was the galley that was used by the Coast Guard in the day-to-day operations. But again, it seems like that you're coming back to an essentially, to a challenge to the factual determination by the board that this was not attributable to a failure of day-to-day maintenance. I mean, the board does say that in several different ways, that there's, has failed to prove that any of the moisture that spilled from the galley area, that any of the rain that wetted the carpet caused extensive corrosion, no proof that some other intervening event did not put moisture into the aircraft, and ultimately that it wasn't attributable to the Coast Guard. So you say that's just factually insupportable. That's factually insupportable. And that's the crux, as I'm hearing you, I take it that's the crux of your argument with respect to liability for the corrosion, that there was simply a failure of substantial evidence to support the board's conclusion as to liability, correct? That's correct, Your Honor. But what I'm also saying is even with no finding about the cause of the corrosion, the contract placed sole responsibility for the actual day-to-day corrosion prevention on the Coast Guard. This is an aircraft that was in the Coast Guard's possession for four years. Well, the sentence that, when you make that argument, the sentence that I'm having trouble with is the sentence in which the board says there's no showing that any lack of maintenance on the part of USCG contributed to the corrosion problem. And that seems to me to be a fact that, if true, answers your argument that it was a problem that the Coast Guard was responsible for and didn't take care of. That conclusion was not supported by the board. Well, okay. But that brings us back to the substantial evidence argument. It seems to me that, as I'm hearing you, there's not a separate legal argument. Well, Your Honor, I would just disagree by the fact that to the extent that that caused the corrosion damage to the aircraft, that doesn't change the fact that the Coast Guard had dated. If there was corrosion and it arose, the Coast Guard was the one responsible to inspect it, find it, and prevent it from spreading. They didn't do that. That's the point I'm trying to make. But I agree, Your Honor, to the extent that the board feels that that factual finding is dispositive, that factual finding was not supported by substantial evidence. So you're saying that regardless of what may have caused it initially, had the day-to-day maintenance for corrosion control been conducted properly, it never would have spread and gotten to the point that the repairs were as extensive as they were? Exactly. All right. Now, you're almost into your rebuttal time, but you still have a few minutes left. So let me ask you a couple other questions. C, if it's true that TKCA did not have any responsibility for this corrosion problem, then why is it that you repaired the corrosion in 2008 without complaining and asking the Coast Guard to pay for that or Homeland Security? And why is it that initially, this time around, you all assumed that obligation? It wasn't until you got charged for the downtime that this legal debate reared its head. That's correct. Back in 2008, when the corrosion was first found, it was part of a $390,000 repair so it could meet the structural inspections, the pass airworthiness, so it could fly again. The corrosion repair part was a de minimis amount. It was like $2,000. It was not worth pursuing. That's why it was not charged in 2008. In 2009 and 2010, what happened was, if you look, the total charges were an accumulation of three bills from Bombardier. The first one was dated January 21. The second and third were in April, April 26, I believe. The submission of the bill did not occur until May. But you're correct, Your Honor. This was a good customer for TKCA. They wanted to keep them happy. There was consideration within the company whether or not to submit this bill to the Coast Guard for repairing the corrosion because they didn't want to upset their customer. And the customer essentially declared war on them by three months after the aircraft returned to service and said, we're deducting $500,000 of money that you earned under this contract because the aircraft couldn't fly. And at that point, they said, okay, if that's the position the Coast Guard's going to take, that's not consistent with the contract and you also have to pay the cost to repair the corrosion. That's the way it arose. Before you sit down, let me ask you a question about your notice arguments. The 95% figure? Correct. Is the 5% supposed to take into account normal depot maintenance? Yes. Okay. So if that's the case, then help me understand how they would have to give you notice of downtime when you already know that it's in depot maintenance. That is by definition downtime, is it not? That's correct. When the aircraft was at Bombardier's facility in 2009, that was not a scheduled depot maintenance repair. What happened was, when the Coast Guard was servicing the aircraft, they overfilled the bathroom, the lavatory. It spilled and leaked all over the back of the aircraft. In order to repair the damage caused by that Coast Guard mistake, they had to fly the aircraft to Hartford to have the aircraft repaired. When they lifted up the carpet to repair that, that's when the corrosion was found near the bulkhead. Under the contract, the downtime assessment, TKCA is not responsible for downtime caused by the Coast Guard. That's why notice is required. Because there were other instances when the aircraft was at repair facilities and went beyond the time it was supposed to, TKCA never received notice and was never charged downtime because TKCA assumed that under the provision, the Coast Guard was assuming liability for that damage. So that's why notice is required. So you're saying that the reason they were there in the first place wasn't your basically scheduled maintenance. This was something that the Coast Guard concedes was caused by them. That's correct. The initial repair. That's correct. But suppose that you had a case in which there was just standard, ordinary depot maintenance, which took, let's say, the full 5% in a given year. So you've used up your 5%, right? The depot maintenance does not count as 5%. It doesn't count? Correct. Okay, so what counts? Suppose there's a special problem with the plane and they bring it in for maintenance. The aircraft is required to be available 95% of the time. Right, so if there's a special problem, there's an engine problem. And they bring it in and it's offline for the 5%, right? And then at the end of the 5%, Bombardier says, we're going to be offline a little longer. Do you get notification at that point from the Coast Guard? Or how do you work out when you start actually paying a requiring, being required to pay a refund? Your Honor, the Coast Guard only has two aircraft. But work with me on that. I was just trying to set up a little foundation. Let's just assume you've got one plane, this contract, you bring it in for repairs, and you hold it for 5% of the year, okay? Now, no notification has been given. Does the clock tick on the 5% for that period that it's in the repair shop? As stated in the contract, by mutual agreement of the parties, the downtime assessment cannot start until the Coast Guard provides notice. So that's the measuring stick. So if the Coast Guard believes that this is a defect with the aircraft and the responsibility of TKCA or Bombardier as its subcontractor, then that downtime assessment must start when the Coast Guard provides notice that we think this is downtime, not our responsibility, your responsibility. And they have to provide that notification on day one if they want all the days to be counted? That's exactly right, Your Honor. You don't get notice clauses that say by mutual agreement of the parties. That's what this one says. And there's a reason for that. Because the Coast Guard had the aircraft in their own possession for the entire life of the aircraft, six years except for 170 days. So if there was a problem with the aircraft, more likely than not, it's the Coast Guard's problem. If the Coast Guard thinks it's a TKCA problem, they have to provide notice. Okay, you're beyond your time. We'll restore three minutes of rebuttal and we'll give an extra two minutes to the other side. Thank you, Your Honor. Mr. Regner? Thank you, Your Honor. May it please the Court. The Board judge correctly found that TKCA did not prove its case. That ultimately it found that the Coast Guard was not responsible for the corrosion and that TKCA did not prove that the corrosion, the ultimate cause of the corrosion, was anything but uncertain. The evidence before the Board was conflicting. There was evidence, for example, that the corrosion was a long-term problem with this aircraft, resulting from, as TKCA's project manager described it, fractional ownership. Meaning that they bought a plane that was owned by somebody else and part of that fractional ownership may have caused the corrosion. There was also other possibilities. An inherent defect in the plane itself was described in one of the bulletins as leakage around the window that would come in underneath the floor. And then there was also evidence, although the Board found it insufficient, of the spilled soda and water theory that TKCA started to put forward after... Suppose that all that is correct and there's problems with the aircraft due to prior ownership. But who's responsible here for the daily maintenance of the aircraft? That's one question. The other one is corrosion. Is that wear and tear? Is that typical wear and tear on an aircraft? That's two questions. Let me address the contractual responsibility for maintenance first. That's TKCA's responsibility. The contract was set up where TKCA would first propose a soup-to-nuts maintenance plan as one option that was not selected by the Coast Guard. And then the second option would be created by TKCA, whatever maintenance, however they wanted to make it, 100%, 0%, or someplace in between for maintenance. And then that was the option, the alternative maintenance plan that was selected by the Coast Guard. And when we look at the contract, the contract spells out very specifically what those responsibilities were. Do you agree with your opponent that the responsibilities for the Coast Guard, including corrosion control... The responsibility on the day-to-day corrosion control was on TKCA. The responsibility for the Coast Guard was to conduct the contractor-specified tasks. And so what you had with the Coast Guard... I'm looking at 5.7.12, and I'm just going to skip down. It says, some of the duties performed by Air Station Washington maintenance personnel include corrosion control. Well, what that's referring to in the... There's two 5.7.1.2. The 5.7.1.2 that's in the solicitation prior to the contract was a menu of items that TKC could include in their alternative plan. The Coast Guard, when it wrote the solicitation, didn't know what plan TKC would propose as its alternate. So it simply said, these are the kinds of things you could do. As it turns out, yes, what TKC suggested was, we will maintain the overall supervision for maintenance onsite at the Coast Guard Air Station, but instead of bringing our wrench turners, our worker bees, to the site to do the work, you'll supply your own. And so the way it was structured under the contract was that the supervision and the direction would come from TKC and that the Coast Guard workmen would come in and do the maintenance themselves. Now, but you keep using the word supervision, but if you look at 5.7.1.2, the TKC proposal, it says to monitor the maintenance by the Coast Guard. It doesn't say supervise. 5.7.1.2 uses the word monitor. It also says that the TKC will coordinate parts delivery, schedule maintenance planning, and coordination. And then also in their proposal, at 240 in the record, it says the project manager, the TKC person... I'm sorry, what was that last reference? At 240, page 240 in the joint appendix. Yeah, okay. It says that TKC will provide a project manager individually responsible for the overall performance of the contract requirements. That's their on-site person who's going to be responsible for the overall performance of the contract requirements, which, because this is put in a maintenance program, would include maintenance. And then we'll keep going through on to 241. I want to walk the court through the contract. On page 241 in the record, it says that there will be a project manager responsible for coordinating for all required maintenance, special equipment, and personnel requirements for MRCCA operating locations. And then on page... Now, just real quickly, I'm sorry to interrupt, but this entire proposal was incorporated by reference into the ultimate contract, correct? That's right. This is TKC's work product and it's part of the contract. Okay. And this was the option that the Coast Guard selected. And then on page 242, it continues to describe the responsibilities of the project manager, who's Mr. Steve Bottolato, as it turned out, to direct the maintenance of the aircraft in coordination with the appropriate service center's scheduling managers. And that's at 242. And then on page 464 in the record, we talk about the depot maintenance, which also included corrosion responsibilities and, of course, depot maintenance was entirely the responsibility of TKC and its subcontractor, Bombardier. I'm sorry. And on page 464, the depot maintenance included general and detailed visual inspections for corrosion. And what the board also found persuasive was the pricing and that the difference in the pricing between the soup-to-nuts plan and the alternate maintenance plan wasn't that much. It was roughly $11,000 a year. And really, the only thing that was being substituted out was the workman. But the supervision having that project manager on site was still part of the contract. And so, getting it done was still, ultimately, TKC's responsibility. And the evidence showed that that's how it played out in practice. Chief Warrant Officer Fitzgerald testified that TKC never told the Coast Guard that it wasn't maintaining the plane properly. That is, TKC told the Coast Guard what to do. The Coast Guard did it. There were no complaints. And so, everything, at least from the Coast Guard's understanding, was that we were doing everything that we were told to do under the contract and the testimony bore that out. And then, ultimately, there was corrosion that was found and that's, so that would be TKC's ultimate responsibility. And the type of, and where it was found also was outside of the scope of the day-to-day maintenance in any event. What Mr. Badlado explained at the time, this was in December before the dispute arose, was that the type of corrosion they were finding was only the kind of corrosion that you would have found if you had pulled up the seat tracks, done more than just lift the carpet, but dug into the structure to look for that corrosion. And that's what they, what they ultimately found and that's what this case is really about is the depot-level maintenance and the corrosion that was found in that context. Let me ask you about the notification issue. Do you agree that scheduled, normally scheduled depot maintenance is not counted against the 5%? No. On page 220 of the record, the contract addresses that very specifically and what it says is that scheduled maintenance is included in the calculation.    on the page. Under 5.17, about two-thirds the way down the page, it says that the depot-level maintenance is included in the calculation. In that paragraph, it begins, all maintenance actions shall be included in the performance metric calculations. You're at, what was the number again? On page 220 of the. 5.17. 5.17. The next to last sentence in that. 5.17, yes. The next to last sentence, all maintenance actions, and that's where I'm reading, shall be included in the performance metric calculations. So that means, I take it at least as you read the contract, we appear to have a dispute on that point here. Yes. That means that on the first day that the plane goes in for routine maintenance at the Hartford facility, let's say, that the 5% limit on unavailability starts to tick, right? That's right. The clock, the 5% clock.    what strikes me as odd here is that if you are required to give notification before the clock starts to tick, that means that the 5% limit on unavailability starts to tick, then you would have to give notification on the first day that it goes in for routine maintenance in order to minimize the excess beyond the 5%, isn't that right? Well, the notice requirement is not read in a vacuum. It comes with a prejudice requirement. I mean, if, for instance, the TKC already knows that it has the plane down for maintenance, whether it's scheduled maintenance or it's, in this case, the corrosion maintenance, there's no notification. I understand. What I'm trying to get at is whether there is, whether there's a problem with the argument that you are required to give notification in all events, even in the case of TKC having taken the plane in for depot maintenance. Your position is, no, I take it. Right, you don't have to give notice in all events. Even though the contract actually seems to say notification is required anytime the plane is unavailable. Well, you would have no notice. I mean, when the plane arrives, you have notice that it's in for maintenance. Notice, but not notification. I mean, sure they have notice, but the contract says notification. So your argument is that, well, notification is not required in that case, right? Well, notification comes with the delivery of the airplane. I would argue that there's no distinction between notice and notification for purposes of a scheduled maintenance once the plane arrives. Explain to me what the point of the notification is. They mutually agreed upon notification requirements. When, other than the fact, when other than circumstances in which the plane was actually in their control, would there be this downtime? Right, well the plane is all over the world. And so, if there is a problem  while the plane is in Timbuktu, then TKC may not know that and so the Coast Guard would have to say, okay, we have a problem with the plane, it's down, start fixing it. You know, whatever the solution is to that problem. But, where the plane is actually in TKC's possession, and here there was actual notice, there was a discussion at the time in December when the plane was down that there was going to be a need for corrosion maintenance and how long it would take. But, even if that hadn't occurred, what more could you do to tell TKC that there was a plane with corrosion that needed to be repaired other than give it to them? They found the corrosion and they knew the extent of the repair before the Coast Guard did. There was no finding of actual notice by the board here. No, the board found that it wasn't necessary under the circumstances. And, just said it, no, the board said it was never necessary if it's in their hands. That's accurate, yes. So, that's different than saying it wasn't necessary under the circumstances. And, so let me get to the circumstances. Do you concede that the reason there was maintenance going on was because there was a spill, something that the Coast Guard had caused? And, that's what initiated the maintenance in the first place? My understanding, and what I've seen in the record, is that it was a scheduled maintenance. And, that's the way the project manager described it in December was that it was already in for a scheduled maintenance and that this would extend that scheduled maintenance period because of the newly discovered corrosion. Can you say that's in the record? Yes. And, that's in his April 6, 2010 letter at page 470 in the joint appendix. But, there was no finding on that point? That was not necessary to the Board's decision. So, there was no finding on that. Do you agree that if the reason that there was a maintenance, whether it was scheduled or not, was something that the Coast Guard caused, that at least initially, that downtime wouldn't be charged against TKCA, correct? If there were, if it was, if for whatever reason it wasn't being charged against TKCA, and I don't agree that that's the case, but if that was the circumstance that was in when the corrosion was discovered, it wouldn't change the analysis in terms of whether notice was necessary or notification was necessary. But, to answer Judge O'Malley's question, wouldn't you, it seems to me that the answer is in the contract that downtime caused by the Coast Guard will not be included in computing availability, right? Well, that's right. All right, well, I'm not sure I understood you. So, what you're saying is, I guess my point is, assuming it's in for maintenance caused by the Coast Guard, which is what your friend on the other side says happened here, and then at some point there's some additional work that needs to get done, you're saying they just have to figure out when that transition period starts to being charged downtime. Well, they knew when that was, but yes, because the Coast Guard couldn't tell them that because the Coast Guard didn't know about the corrosion until they learned it from TKC. It went in for whatever maintenance was needed in December of 2009, and then, however they found the phone rings or whatever, the Coast Guard gets information from TKC that we were looking at your plane, we pulled up the floorboards and we found the corrosion. And so, TKC knew before the Coast Guard knew, and I think that's what the board was getting at was how could it possibly make sense for, and of course they're the experts on planes and corrosion, how could the Coast Guard be in a position to tell them anything? They could only say, yeah, and what you just said we're telling you right back. It wouldn't make sense to give that notice. But the question is, I mean, why should we make them give notices different from whether or not the contract requires them to give notices? Well, that's right. And under the Bath Iron Works case, what this court has said in that case was that where there is a notice requirement, it only matters. It's only going to be enforced where there's prejudice. You don't have to tell the party that's entitled to notice exactly what they already knew. It doesn't make any sense to do that. And so, if you're going to enforce the notice requirement, you have to show prejudice as a result of the lack of notice. But in order even to read this contract on its plane terms, it's simply, you can't give notice to somebody that is giving you the notice. I guess that's where I think the board landed and that's where you have to keep coming back to is that the only thing the Coast Guard could possibly have told TKC was what TKC was telling the Coast Guard, that there was a plane there that it was... But that's not... Is that really what the notice is about where the Coast Guard would simply tell TKC, well, there's a corrosion problem and they told you that? Isn't that responsible for it? And this notification is to let you know that we're assigning some sort of responsibility and in the event there's a dispute down the line, this is a notice, this is where the clock starts? Well, that's right and there's two components to that. Yes, part of it is to let the other side know and this is where the prejudice comes in, that yes, we're going to charge you with the downtime or the cost or whatever so that you have the ability now to react and say... And that type of notice was not provided by the Coast Guard? Well, that type of notice was provided by the Coast Guard. There was a conversation in December of 2010 where the Coast Guard and TKC discussed what was going to be happening and how that would affect the downtime. But the fact of the matter is at that time, TKC believed  and they were saying that internally and they were saying Bombardier was going to eat the cost, those kinds of phrases so there was... And the Coast Guard was not providing that type of notice. And on top of that, TKC also made the statement in April of 2010 that we did everything we could to hustle that maintenance along. That was Mr. Batalado again writing before the dispute arose that there was no prejudice because they were already acting as if they had that notice because they believed it was their responsibility and they were doing everything they could to bring that plane back into service as quickly as they could and that came from their project manager's letter. You said a conversation in December 2010? Do you mean December 2009? I meant December 2009. Okay. Yes. I was scrambling through the records. My apologies and that can be found at page 470 in the Joint Appendix. Okay. Thank you. Okay. Thank you. Thank you.     The Joint Appendix page 346 is the notice that was issued by the Coast Guard to the Coast Guard and the Coast Guard and the Coast Guard and the Coast Guard and the Coast Guard is the notice where the Coast Guard made the downtime assessment and it says on that page the only scheduled maintenance for this period was December 1 to December 19 for carpet repair due to laboratory over service. This was deemed to be caused by the Coast Guard. That's why it was in. It was in there to repair a defect caused by the Coast Guard. There has been no written notice under the contract. As far as prejudice goes, the board itself found the prejudice that TKCA suffered. On page 8 of the decision it says the assessment talking about the downtime assessment the assessment took place over three months after the aircraft arrived in Hartford and over two and a half months after the aircraft had been repaired and returned to service. At that point it was difficult if not impossible to conduct an accurate analysis of the cause of the corrosion. So, if in December 2009 the Coast Guard had provided the notice required under the downtime assessment when it was there for the laboratory over service then they could have done an investigation while it was pulled up and they could have had Coast Guard expert there a TKCA expert a Bombardier expert whatever and they could have come to an agreement this is the cause of the corrosion. No notice was ever provided that there was going to be a $500,000 downtime assessment. Now, quickly the 19 days that's referenced on 346 in the third paragraph you weren't charged for that, right? That's correct. That was for the over service to the laboratory. That was taken off the Coast Guard caused issue. Another point that my colleague made he said that the difference in the price and the reason why the board found for the government was $11,000 a year in the different maintenance plans. That's wrong. Joint Appendix 175 is $14,000 a month was the difference in the price. Over 12 months it's $280,000 TKCA is a small business that's a huge amount of money and that is what the Coast Guard the savings the Coast Guard got by undertaking the corrosion repair responsibility. Lastly, my colleague mentioned leakage around the emergency exit that was dealt with in our brief but it was clear that that couldn't have been the cause of the corrosion in this case. The emergency exit like it is in all aircraft of this type is in the middle of the aircraft. There's no signs of water damage from below the window and the corrosion damage ran after the plane sits with the nose up when it's parked. So if there's water coming in the corrosion damage would not have run from the galley backwards. It would have run from the window towards the laboratory. There's no finding of any such damage. One last point I want to make, Your Honor, I believe we made it clearly in the brief but there's no way the government can get around the risk of loss clause in this contract. The risk of loss clause clearly says that when the aircraft is in the Coast Guard's possession they're responsible for all damage to the aircraft. There's no finding here that this was normal wear and tear and that was dealt with in Mr. Boyle's testimony which is in the appendix that this could not have been normal wear and tear on page 54 of the appendix is the testimony    have been normal wear and tear. Thank you, Your Honor. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.                Thank you! Thank you! Thank you! Thank you! Thank you! cido! cido! Don! Don! Don! Don!